No. 25-633

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

WYNNEWOOD MONTANA REFINING LLC,

*Petitioner*,

v.

EPA,

*Respondent.*

———————————

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

———————————

## MOTION OF GROWTH ENERGY TO
## INTERVENE IN SUPPORT OF RESPONDENT

On January 31, 2025, Calumet Montana Refining LLC ("Calumet")

petitioned for review of EPA's decision denying its petition for exemption from its

obligations under the Renewable Fuel Standard ("RFS") for 2023.  *See* Petition for

Review, ECF #1.1.  If successful, this lawsuit will impair Growth Energy's

significant interests in the RFS.  Accordingly, Growth Energy respectfully moves

to intervene in support of respondent, EPA.

Petitioner states that it opposes this motion.  EPA reserves its position on

this motion.

1

## BACKGROUND

### A.    Annual National Volume Requirements Under the RFS

"[I]n order to move the United States toward greater energy independence and security and increase the production of clean renewable fuels," Congress amended the Clean Air Act to create the RFS, which "requires that increasing volumes of renewable fuel be introduced into the Nation's supply of transportation fuel each year." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017) (quotation cleaned).  "Therefore, … [national] demand for renewable fuel [is] a function of the renewable fuel standards." *Id.* at 710 (quotation cleaned).

Under the RFS, there are annual national requirements—called "applicable volumes"—specifying how many gallons of each of several "nested" categories of renewable fuel must be used in the nation's transportation-fuel supply: "total" renewable fuel; "advanced biofuel," which is a subset of the total; and "biomass-based diesel" and "cellulosic biofuel," both of which are subsets of "advanced biofuel." *Americans for Clean Energy*, 864 F.3d at 697-698, 701, 710.  The difference between the total and advanced requirements is often called the "implied non-advanced" or "implied conventional" requirement.  *Sinclair Wyoming Refining Co.* v. *EPA*, 101 F.4th 871, 878, 887 (D.C. Cir. 2024).

EPA has designated refineries and importers of petroleum-based gasoline and diesel fuel as the "obligated parties" that must comply with the RFS's

2

percentage standards. 40 C.F.R. §80.2; *see* §7545(*o*)(2)(A)(iii), (3)(B)(ii).

Obligated parties "must ensure" that the required volumes of renewable fuel are

used. *Americans for Clean Energy*, 864 F.3d at 697. To operationalize the volume

requirements for the myriad obligated parties, EPA "translat[es]" the volume

requirements "into 'percentage standards,'" which "represent the percentage of

transportation fuel introduced into commerce that must consist of renewable fuel."

*Americans for Clean Energy*, 864 F.3d at 699; *see* §7545(*o*)(3)(B)(i)-(ii); 40 C.F.R.

§80.1405(c). That is, the percentage standards (roughly) equal the national

mandated renewable-fuel volumes divided by the total national volume of gasoline

and diesel fuel that EPA projects will be used in the relevant year. "The

percentage standards inform each obligated party of how much [of each category

of] renewable fuel it must introduce into U.S. commerce based on the volumes of

fossil-based gasoline or diesel it imports or produces." *Americans for Clean

Energy*, 864 F.3d at 699; *see* 40 C.F.R. §80.1407(a). "In other words, the EPA

estimates what percentage of the overall fuel supply each renewable-fuel

[category] should constitute and then requires each obligated party to replicate

those percentages on an individual basis." *Growth Energy* v. *EPA*, 5 F.4th 1, 11

(D.C. Cir. 2021).

EPA "polices these mandates with a system of credits." *HollyFrontier

Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 386 (2021); *see*

3

§7545(*o*)(5). "Each credit"—called a RIN—"represents the blending of [an ethanol-equivalent gallon] of renewable fuel" into gasoline or diesel fuel. *HollyFrontier*, 594 U.S. at 386; *see* 40 C.F.R. §80.1415. "A refinery that blends renewables may either 'retire' the credits it has earned (*i.e.*, use them) to satisfy its own RF[S] volume obligation—or sell those credits to a different [obligated party] that needs them." *HollyFrontier*, 594 U.S. at 386; *see* 40 C.F.R. §§80.1428-80.1429. RINs that have not been used for compliance in the year in which they were generated may be "carried over" for compliance in the future; such RINs are called "carryover RINs" and the collective amount of carryover RINs at any given time is called the "carryover RIN bank." *See Americans for Clean Energy*, 864 F.3d at 699, 713-714; 40 C.F.R. §80.1427.

To illustrate with a simplified example: If the required national renewable-fuel volume for 2025 is 10 billion gallons and the total projected transportation-fuel use for 2025 is 100 billion gallons, EPA would set the 2025 percentage standard at 10%. Then, if an obligated party introduced 5 million gallons of transportation fuel into commerce during 2025, its RFS obligation would be 500,000 gallons of renewable fuel, which it would satisfy by blending that amount of renewable fuel into its gasoline and diesel, buying that number of RINs in the market (possibly including carryover RINs), or doing a mix of both.

### B.    Small-Refinery Exemptions Under the RFS

Congress allowed "small refineries"—refineries whose "throughput" is below a specified level, §7545(*o*)(1)(K)—to be exempted from their RFS obligations for a given year under limited circumstances. Individual small refineries may "petition" EPA for an exemption (technically, for an extension of their prior exemption) by showing that they "would be subject to a disproportionate economic hardship if required to comply with" their RFS obligations. §7545(*o*)(9)(A)(ii), (B)(i).

Although small-refinery exemptions (sometimes called "SREs") are granted to individual small refineries, they necessarily affect RFS obligations nationally. Under EPA's formula for computing the annual percentage standards that apply to all non-exempt obligated parties, EPA accounts for small-refinery exemptions to a certain extent: when setting the standards for a given year, EPA "increas[es] the [percentage] standards on [all] non-exempt obligated parties" for that year by the amount needed to offset all exemptions that were already granted for that year and by the estimated amount needed to offset all exemptions that are projected to be granted for that year. *Renewable Fuel Standard (RFS) Program: RFS Annual Rules*, 87 Fed. Reg. 39,600, 39,632:2 (July 1, 2022); *see Sinclair Wyoming*, 101 F.4th at 890-892; 40 C.F.R. §80.1405(c).

EPA, however, does not adjust the percentage standards to account for exemptions to the extent they are granted after EPA promulgates the standards for the exempted year and they exceed EPA's projection of exemptions for that year. Whenever EPA does not adjust the percentage standards to account for an exemption, the exemption "hinder[s] the achievement of the applicable renewable-fuel volumes because [the exemption] artificially inflate[s] the denominator—the nation's total supply of petroleum-based transportation fuel—and thereby reduce[s] the percentage standards applied to nonexempt refiners and importers." *Sinclair Wyoming*, 101 F.4th at 881. In other words, exemptions that are not accounted for in the percentage standards create a "renewable-fuel shortfall" relative to the national amount of renewable fuel that was supposed to be used. *American Fuel & Petrochemical Manufacturers* v. *EPA*, 937 F.3d 559, 571, 588 (D.C. Cir. 2019); *see also Growth Energy*, 5 F.4th at 12 (exemptions "granted after EPA has promulgated that year's standards … hinder achievement of the applicable volumes"). Or, as EPA has put it, unaccounted-for exemptions "effectively reduce[] the required volume of renewable fuel" and in turn reduce the marginal demand for renewable fuel, including ethanol. EPA, Regulatory Impact Analysis 5-7, 46 (June 2022).[1]

---

[1] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P10155TQ.pdf.

When EPA promulgated the standards for 2023, it projected zero exemptions for that year. *Renewable Fuel Standard Program: Renewable Fuel (RFS) Program: Standards for 2023-2025 and Other Changes*, 88 Fed. Reg. 44,468, 44,520:2-44,521:1 & Table VII.C.1 (July 12, 2023). So, if EPA eventually grants an exemption for 2023, the exemption will not be accounted for in any annual RFS standards and the exemption will reduce the required national volume of renewable fuel.

### C.    EPA's Denial of Calumet's Petition for a Small-Refinery Exemption

Calumet petitioned EPA for a small-refinery exemption from its RFS obligations for 2023. On January 2, 2025, EPA denied that petition. Pet. at 1. Calumet then petitioned for review of that denial on January 30, 2025.

### D.    Growth Energy

Ethanol is the predominant renewable fuel under the RFS: ethanol is used to meet about 70% of the total RFS requirement annually and about 95% of the implied non-advanced RFS requirement annually. Declaration of Emily Skor ("Skor Declaration") ¶8 (Mar. 3, 2025) [attached as Ex.].

Growth Energy is a national trade association dedicated to promoting the commercial production and use of ethanol on behalf of its 97 members, who are domestic ethanol producers. Skor Declaration ¶¶2-3. Growth Energy's members collectively produce about two-thirds of the ethanol used to meet the RFS

7

requirements annually, or about 45% of the total RFS requirement and about 65% of the implied non-advanced requirement. *Id.* ¶9.

## ARGUMENT

Federal Rule of Appellate Procedure 15(d) and Circuit Rule 15.5 establish procedural requirements for intervention on appeal. For the substantive requirements, courts look to the standards that govern intervention in district court, i.e., Federal Rule of Civil Procedure 24. *See Automobile Workers v. Scofield*, 382 U.S. 205, 216-17 & n. 10 (1965); *Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997). Thus, a party has a right to intervene if it "claims an interest relating to the … transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

Growth Energy satisfies this standard. *A fortiori*, Growth Energy satisfies the standard for permissive intervention, which requires only a showing that the proposed intervenor has "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).[2]

---

[2]     This motion satisfies those procedural requirements. The motion is timely because it was filed within 30 days of the filing of the petition for review. The motion is being served on all parties to the case. And the discussion in the text

8

**A.**     **Circuit Courts Have Routinely Allowed Growth Energy to Participate in Litigation Involving RFS Exemption Decisions**

Circuits have routinely permitted Growth Energy to participate in litigation involving RFS exemption decisions.  When certain small refineries challenged EPA's denial of their exemption petitions for 2022, the Fifth and Eleventh Circuits granted Growth Energy's opposed motions to intervene to defend the denials. Order, *San Antonio Refinery v. EPA*, No. 23-60399, ECF #51 (5th Cir. Sept. 12, 2023); Order, *Wynnewood v. EPA*, No. 23-60427, ECF #27 (5th Cir. Aug. 30, 2023); *Hunt Refining Co. v. EPA*, No. 23-12347, ECF #27 (11th Cir. Oct. 6, 2023). When small refineries challenged EPA's denial of their exemption petitions for 2017-2021, the D.C. and Fifth Circuits granted Growth Energy's opposed motions to intervene to defend the denials.  Order, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1073, ECF #1987065 (D.C. Cir. Feb. 22, 2023); Order, *Calumet Shreveport Refining LLC et al. v. EPA*, No. 22-60266, ECF #303 (5th Cir. Mar. 16, 2023); Order, *Wynnewood v. EPA*, No. 22-60425, ECF #328 (5th Cir. Mar. 16, 2023).

Only once has any court denied a motion by Growth Energy (or another representative of biofuels producers) to intervene in a case involving a small-refinery exemption action, but the circumstances in that Eleventh Circuit case were

---

constitutes "a concise statement of [Growth Energy's] interest … and the grounds for intervention."  Fed. R. Civ. P. 15(d).

unique: Growth Energy's intervention motion was, as the petitioning refinery said in its opposition thereto, "far too late," coming after the refinery "had already filed its opening merits brief." Pet'r's Resp. to Mot. of Renewable Fuels Producers to Intervene 1-2, *Hunt Refining Co. v. EPA*, No. 22-11617, ECF #66 (11th Cir. Mar. 3, 2023); *see* Order, *id.*, ECF #88 (11th Cir. Apr. 28, 2023). That the Eleventh Circuit's denial was purely based on the motion's untimeliness is confirmed by the fact that the same court granted Growth Energy's timely but otherwise identical intervention motion in the subsequent exemption case. *See Hunt Refining*, No. 23-12347, ECF #27.

Additionally, the Tenth Circuit held that an association of renewable-fuel producers had standing to challenge decisions by EPA to grant certain small-refinery exemptions. *Renewable Fuels Ass'n*, 948 F.3d 1206, 1230-39 (10th Cir. 2020). *A fortiori*, an association of renewable-fuel producers is an appropriate intervenor to defend a denial of small-refinery exemptions.

There is no reason for the Court to depart from the circuits' consistent recognition that Growth Energy is entitled to participate in challenges to RFS exemption decisions.

**B.     The Disposition of This Case Could Impair Growth Energy's Strong Interest in the RFS Obligations and the Standards Governing Small-Refinery Exemption Petitions**

The Court's decision in this case could harm Growth Energy's members' interest in selling renewable fuel for compliance with RFS standards.

The level of the RFS standards determines the national demand for renewable fuel, including ethanol, most of which is produced by Growth Energy's members. *Supra* pp.2, 6; Skor Decl. ¶¶4-5, 8-9. Accordingly, EPA has long acknowledged that "those involved with the production, distribution, and sale of … renewable fuels (*e.g.*, ethanol[)]" are "potentially affected by" the level of the annual RFS requirements. 88 Fed. Reg. at 44,468:3. That is why Growth Energy consistently submits extensive comments on proposed RFS annual standards, including for 2023, and on EPA's proposed actions on exemption petitions. *See, e.g.*, Growth Energy, *Comments on EPA's Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes*, EPA-HQ-OAR-2021-0427-0796 (Feb. 10, 2023)[3]; Growth Energy, *Comments on EPA's Proposed RFS Small Refinery Exemption Decision* (Feb. 7, 2022)[4]

---

[3] https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0427-0796.

[4] https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0566-0073.

This interest is jeopardized by Calumet's lawsuit.  If Calumet's petition for a 2023 exemption is granted, the associated renewable-fuel volumes will not be made up.  *See supra* pp.6-7.  Instead, the exemption will "effectively reduce[] the required volume of renewable fuel."  EPA, Regulatory Impact Analysis at 5-7, 46[5]; *see* Skor Decl. ¶11.  And because the "demand for renewable fuel [is] a function of the renewable fuel standards," *Americans for Clean Energy*, 864 F.3d at 710 (quotation cleaned), "the basic laws of economics" establish that granting the exemption—and in turn reducing the required volume of renewable fuel—will "cause the demand" for Growth Energy's members' ethanol "to drop," *Growth Energy v. EPA*, 5 F.4th 1, 3 (D.C. Cir. 2021); *see also Monroe Energy, LLC v. EPA*, 750 F.3d 909, 917 (D.C. Cir. 2014); Skor Declaration ¶¶11-12.  Put another way, RFS standards function as a regulatory barrier to competition between petroleum and renewable fuels, and so, if granted, Calumet's exemption would "lift that regulatory restriction[] on [Growth Energy's members'] competitors." *American Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021); *see* Skor Declaration ¶¶6-7.

In fact, although renewable-fuel producers are not designated as "obligated parties" under the RFS, they are a direct object of every exemption decision

---

[5] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P10155TQ.pdf.

because RFS "annual standards" "directly regulate biofuel producers" by mandating the amount of renewable fuel that must be supplied and used, *American Fuel*, 937 F.3d at 595, and exemption decisions affect the level of those annual standards. *See Energy Future Coalition* v. *EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.) (although "regulation [prohibiting use of certain biofuel in vehicles] is technically directed at vehicle manufacturers," biofuel producers were also "an object of the action").

It makes no difference that 2023 is over. Granting Calumet's exemption petition would relieve Calumet of its obligation to use RINs (credits) to meet its 2023 RFS requirements, freeing those RINs to be used by any obligated party to meet a *future* year's requirements and thereby reducing the national demand for renewable fuel in that future year and lifting a barrier to competition with petroleum in that future year. *See, e.g.*, 87 Fed. Reg. at 39,613:1-2, 39,617:2 ("[C]ompliance with the RFS standards for one year is inherently intertwined with compliance for the prior year. … Any market effects of the 2020 and 2021 volumes finalized in this rule will be felt after the rule is promulgated and mediated through the carryover RIN bank."); *Renewable Fuel Standard Program: Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes*, 85 Fed. Reg. 7,016, 7,021:3 (Feb. 6, 2020) ("This increase in the carryover RIN bank is primarily the result of the millions of RINs that were

13

unretired by small refineries that were granted hardship exemptions after the July 29 proposal."); Skor Declaration ¶13.

Moreover, the Court's decision in this case could establish a standard governing EPA's adjudication of all future exemption petitions from refineries at least within the Circuit. Therefore, the decision could have far-reaching consequences for the mandated volume of renewable fuel and consequently for Growth Energy's members' ethanol.

### C. Growth Energy's Interest Will Not Be Adequately Represented by Another Party

This may be Growth Energy's only opportunity to refute Calumet's claims and preserve EPA's denial of Calumet's exemption petition for 2023. And no other party will adequately represent Growth Energy's interests. "The requirement of [Rule 24] is satisfied if the [movant] shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *see also Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 181 (2022) (requirement "present[s] proposed intervenors with only a minimal challenge").

As a government agency, EPA will not adequately represent Growth Energy's interests. Courts generally "look skeptically on government entities serving as adequate advocates for private parties." *Crossroads Grassroots Policy Strategies*

14

*v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015).  A government entity may not adequately represent a private party even when there is "general alignment" between their litigation positions.  *Id*.

Such is the case here.  Renewable-fuel producers are not EPA's constituents and EPA is not charged under the Clean Air Act with representing their interests. It is charged with setting national renewable-fuel standards, deciding whether to waive those standards, deciding whether to grant exemptions, and establishing a system of tradeable credits.  *See* §7545(*o*).  EPA's arguments in this case necessarily will be focused on its own institutional interests and duties, whereas Growth Energy's arguments will reflect the interests of the commercial enterprises that comprise its membership.  Consequently, Growth Energy may take a different view of EPA's role in this case.  For example, Growth Energy will emphasize the harm to ethanol producers that Calumet's requested relief would cause, whereas EPA might not.  And EPA might argue that it had wider discretion than Growth Energy would endorse.

Indeed, these types of divergences occurred in prior cases involving challenges to exemption denials.  *See, e.g.*, Brief of Renewable Fuel Producers 21-23, 28, 34-36, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1073, ECF #2035172 (D.C. Cir. Jan 10, 2024) (arguing EPA lacks legal authority to take certain remedial action that EPA took for other exemption years and that such action would harm

ethanol producers); Brief of Renewable Fuel Producers 17, 22-23, 25, *Calumet Shreveport Refining LLC v. EPA*, No. 22-60266, ECF #314 (5th Cir. May 18, 2023) (same). Such divergences have been common across the many RFS cases in which Growth Energy has intervened to defend EPA's action.

And the potential for divergence is even greater now that EPA has declared that "new Agency leadership" intends "to review the underlying action." Unopposed Mot. to Hold Case in Abeyance at 1, ECF #12.1 (Feb. 27, 2025); *see also* Mot. of the Pet'r to Hold the Briefing Schedule in Abeyance at 3, *EPA v. Calumet Shreveport Refining LLC*, No. 23-1229 (U.S. Jan. 24, 2025) (stating EPA intends to "reassess the basis for and soundness of" at least some recent exemption decisions).

All this more than suffices to carry Growth Energy's "minimal" burden.

## CONCLUSION

For the foregoing reasons, the Court should grant Growth Energy's motion to intervene.

Respectfully submitted,

/s/ David M. Lehn
DAVID M. LEHN
BOIES SCHILLER FLEXNER LLP
1401 NEW YORK Avenue NW
Washington, DC 20035
(202) 237-2727
dlehn@bsfllp.com

March 3, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies:

1.      This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 3,220 words, excluding the exempted portions, as provided in Federal Rule of Appellate Procedure 32(f).  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.      This motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)(A) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Lehn
DAVID M. LEHN

March 3, 2025

# CERTIFICATE OF SERVICE

I certify that on March 3, 2025, I filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.


/s/ David M. Lehn
DAVID M. LEHN

March 3, 2025

# EXHIBIT

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| _____ ) | |
| CALUMET MONTANA REFINING LLC, ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 25-633 |
| v. ) | |
| ) | |
| ENVIRONMENTAL PROTECTION AGENCY, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |
| ) | |

## <u>DECLARATION OF EMILY SKOR</u>

1.      I, Emily Skor, am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of Growth Energy in the above-captioned matter.

2.      I serve as the CEO of Growth Energy, a position I have held since May 2016. Growth Energy is a national trade association dedicated to promoting the commercial production and use of renewable fuels, particularly conventional and cellulosic ethanol.

3.      Today, Growth Energy has 97 members, all of which produce and sell ethanol in the United States.

4.     The Renewable Fuel Standard ("RFS") annual requirements define the domestic demand for renewable fuel, including ethanol, for use in transportation fuel.

5.     In the national market for transportation fuel, renewable fuel—including the ethanol produced by Growth Energy's members—competes with petroleum-based fuel. Any ethanol or other renewable fuel that is used for transportation purposes displaces the petroleum-based fuel that would otherwise be used.

6.     Because RFS obligated parties participate in the *petroleum* industry—they are petroleum refiners and importers—they have a strong economic incentive to maximize the percentage of petroleum in transportation fuel and to minimize the percentage of renewable fuel in transportation fuel.

7.     RFS standards inherently restrict the scope of competition between petroleum and renewable-fuel producers. By defining the minimum percentage of transportation fuel that must be renewable fuel, the RFS standards exclude petroleum from that percentage of the transportation-fuel market. Raising RFS standards expands the portion of the market from which petroleum is excluded; lowering RFS standards expands the portion of the market in which petroleum can compete with renewable fuel.

8.     In 2023, about 14.2 billion gallons of ethanol were used to comply with the RFS. That constituted about 68% of all renewable fuel used to comply with the RFS and about 95% of the renewable fuel used to comply with the RFS's "implied conventional" requirement (i.e., the difference between the total requirement and the advanced requirement). In 2024 and future years, ethanol is projected to account for similar percentages of the renewable fuel used to comply with the RFS.

9.     In 2023, Growth Energy's members collectively produced about 9.5 billion gallons of ethanol in response to and largely to comply with the RFS. That constituted about 45% of all renewable fuel used to comply with the RFS and about 63% of the renewable fuel used to comply with the RFS's "implied conventional" requirement. In 2024 and future years, Growth Energy's members are projected to account for similar percentages of the renewable fuel used to comply with the RFS.

10.     For purposes of use in transportation fuel, the ethanol produced by each of Growth Energy's members and by other ethanol producers that are not members of Growth Energy is interchangeable. Thus, raising or lowering RFS standards affects each Growth Energy member in the same way and roughly proportional to their preexisting market share.

11. When EPA grants exemptions without adjusting its national RFS standards to account for them, the exemptions in effect reduce the national demand for renewable fuel, including and especially ethanol.

12. Because EPA projected zero exemptions when it set the 2023 RFS standards, any exemption granted for 2023 now or hereafter—to Calumet Montana Refining LLC or any other obligated party—would not be accounted for in the national RFS standard, and therefore such an exemption would reduce the national demand for renewable fuel, including and especially ethanol.

13. This reduction in demand for ethanol would be felt by Growth Energy's members in the future even though the exemption was for a past year. To comply with its 2023 RFS obligations, Calumet Montana must retire a sufficient number of RINs. If Calumet Montana receives an exemption for 2023, however, it will not need to retire those RINs and instead those RINs will go into the pool of available RINs that any non-exempt obligated party could use for compliance. Those RINs, therefore, would obviate the need for non-exempt obligated parties to buy and blend an equivalent amount of additional gallons of renewable fuel into transportation fuel to achieve RFS compliance.

14. In sum, granting Calumet Montana's requested exemption for 2023 will reduce the sales of Growth Energy's members' ethanol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge and information prepared by Growth Energy.

Executed this 3rd day of March 2025.


Emily Skor